**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

EDWIN A. JIMÉNEZ-CRUZ,

     Plaintiff,

       v.                                              CIVIL NO.: 09-1812 (MEL)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.

**OPINION AND ORDER**

**I.    PROCEDURAL POSTURE**

Plaintiff Edwin A. Jiménez-Cruz ("plaintiff" or "claimant") was born in May of 1959.

(Tr. 80.)  He attended school through the ninth grade, and worked as a carpenter's assistant, a

janitor, and finally as a plant employee at a dairy company.  (Tr. 100, 124, 131.)  He left his most

recent position as a plant employee on June 19, 2002, claiming he could not return to work due

to discogenic disease, bilateral carpal tunnel syndrome, lumbar strain with radiculopathy, and

depression.  (Tr. 123.)

On August 27, 2003, plaintiff filed an application for a period of disability and insurance

benefits pursuant to Title II and Part A of Title XVIII of the Social Security Act, 42 U.S.C.

§ 416(I), 423 (2012).  (Tr. 80-85.)  Plaintiff alleged disability beginning on June 18, 2002.

(Tr. 123.)  His application for Social Security benefits was denied initially on May 6, 2004 and

upon reconsideration on December 20, 2004.  (Tr. 48-56, 58-65.)  On February 8, 2005, claimant

filed a request for a hearing before an Administrative Law Judge ("ALJ"), which was scheduled

to take place on May 15, 2007.  (Tr. 42-45, 66.)

Plaintiff received a Notice of Hearing dated April 9, 2007, and on that same day, plaintiff's counsel prepared a motion to waive his appearance at the hearing.  (Tr. 16.)  Plaintiff signed a sworn statement in support of the motion, stating that he was waiving his right to be present and be heard at the hearing, but he was not renouncing his right "to an impartial and complete hearing where [he] will appear through [his] attorney."  (Tr. 17.)  On May 15, 2007, when plaintiff's counsel appeared at the hearing alone, the ALJ cancelled the hearing due to plaintiff's failure to appear.  (Tr. 27-29.)[1]  The ALJ gave plaintiff's counsel seven days to submit written arguments and evidence in support of plaintiff's case.  (Tr. 27.)  He also notified counsel that he would decide the case based on the medical evidence in the record and any written arguments and additional evidence that counsel wished to submit for the record.  (Tr. 29.)

The following day, plaintiff's counsel submitted a motion requesting reopening of the record and a continuance of the hearing, which the ALJ denied "as improvident under the law." (Tr. 10, 27.)  Plaintiff failed to submit any written arguments or evidence in the allotted seven days following the cancelled the hearing.  (Tr. 15, 27-28.)  On June 28, 2007, the ALJ issued a decision concluding that plaintiff was not disabled under the Social Security Act.  (Tr. 27-39.) Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council on August 17, 2007, along with a brief in support of his request for review.  (Tr. 10-14, 20.)  The Appeals Council denied plaintiff's request for review on June 17, 2009; therefore, the ALJ's decision became the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant").  (Tr. 5-7.)

---

[1] The motion for waiver of appearance has a stamp on it from the Social Security Office of Disability Review in Mayagüez, Puerto Rico, dated May 15, 2007.  Because plaintiff's hearing was to take place on that date in Mayagüez, it appears that the waiver request was submitted on the same day as the hearing.

On August 17, 2009, plaintiff filed the instant complaint pursuant to 42 U.S.C. § 405(g)[2] and 5 U.S.C. § 706, requesting review of the Commissioner's decision, alleging that the decision was not based on substantial evidence. (Docket No. 1.)  Both parties have filed memoranda of law. (Docket Nos. 13, 14, 17.)

## II.   LEGAL STANDARDS

### A.   Standard of Review

Once the Commissioner has rendered his final determination on an application for disability benefits, a district court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing [that decision], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The court's review is limited to determining whether the ALJ employed the proper legal standards and whether his factual findings were grounded upon sufficient evidence.  Id.  Specifically, the court "must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error."  López-Vargas v. Comm'r of Soc. Sec., 518 F. Supp. 2d 333, 335 (D.P.R. 2007) (citing Manso Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curium)).

Additionally, "[t]he findings of the Commissioner [ ] as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. N.L.R.B., 305 U.S. 292, 300 (1938)).  The standard requires "'more than a mere scintilla of evidence but may be

---

[2] Although plaintiff's complaint cites 42 U.S.C. § 404(g), the court infers that this is a typographical error, as it is Section 405(g) that provides the right to judicial review of Social Security disability determinations.

somewhat less than a preponderance' of the evidence." Hernández-Guzmán v. Astrue, Civil No. 08-2240, 2009 WL 3526485, at *2 (D.P.R. Oct. 23, 2009) (quoting Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971)).

While the Commissioner's fact findings are conclusive when they are supported by substantial evidence, they are "not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam) (citing Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986) (per curiam); Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)).  Moreover, a determination of substantiality must be made based on the record as a whole.  See Irlanda Ortiz, 955 F.2d at 769 (citing Rodríguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  However, "[i]t is the responsibility of the [ALJ] to determine issues of credibility and to draw inferences from the record evidence."  Id. Therefore, the court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodríguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).

### B.  Disability Under the Social Security Act

To establish entitlement to disability benefits, the claimant bears the burden of proving that he is disabled within the meaning of the Social Security Act.  See Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 146-47 (1987).  An individual is deemed to be disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S. C. § 423(d)(1)(A).

Claims for disability benefits are evaluated according a five-step sequential process. 20 C.F.R. § 404.1520; Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999); Yuckert, 482 U.S. at 140-42. Step one requires the ALJ to determine whether the claimant is working and thus engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, then disability benefits are denied. 20 C.F.R. § 404.1520(b). At step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). If he does, then the ALJ moves to step three to determine whether the claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R part 404, subpart P, appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, then he is conclusively found to be disabled. 20 C.F.R. § 404.1520(d). If not, then the ALJ goes on to step four and assesses whether the claimant's impairment or impairments prevent him from doing the type of work he has done in the past. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant can perform his past relevant work despite his impairment(s), then disability benefits are denied. 20 C.F.R. § 404.1520(f). If the ALJ concludes that the claimant's impairment or impairments do prevent him from performing his past relevant work, the analysis then proceeds to step five. At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[3] combined with his age, education, and work experience, allows him to perform any other work that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is

---

[3] An individual's residual functional capacity is the most that she can do in a work setting despite the limitations imposed by his mental and physical impairments. 20 C.F.R. § 404.1545(a)(1).

work in the national economy that the claimant can perform, then disability benefits are denied. 20 C.F.R. § 404.1520(g).

Under steps one through four, the plaintiff has the burden of proving that he cannot return to his former job because of his impairment or combination of impairments.  Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir.1989) (per curiam).  Once he has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform." Id.

**III.     The ALJ's Findings**

After evaluating the evidence on record, the ALJ made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.  (Tr. 31.)

2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 18, 2002 through his date last insured.  (Tr. 18.)

3.  Through the date last insured, the claimant had the following severe impairments: "left carpal tunnel syndrome, cervical myositis, lower back pain with muscular spasms, herniated disc at the L4-L5 level to the right [shown] by [a] Magnetic Resonance Imaging (MRI) study with bilateral radiculopathy at the L5 root to the left [shown] by Electromyographic and Nerve Conduction (EMG/NCV) studies, lumbar spondylosis, and a moderate major depressive disorder with anxiety." (Tr. 31.)

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 36.)

5. Through the date last insured, the claimant had the residual functional capacity ("RFC") to perform light, "simple, unskilled work activity." (Tr. 36.)  The claimant has the physical RFC "to sit[,] stand and walk for about 6 hours daily in an 8-hour day, lift and carry a maximum of 20 pounds and 10 pounds frequently and to otherwise function normally in activities not requiring frequent climbing, stooping or climbing [sic], from the physical standpoint."  Additionally, plaintiff's mental RFC "limits him to simple, unskilled work activity." (Tr. 36.)

6. Through the date last insured, the claimant was unable to perform his past relevant work as a "material handler" because it "required lifting and carrying over 20 pounds and prolonged standing on a regular basis, which exceed his residual functional capacity." (Tr. 38.)

7. Plaintiff is, however, able to perform other jobs that exist in significant numbers in the national economy, in light of his age, education, work experience, and residual functional capacity. (Tr. 38.)

8. Accordingly, the ALJ found that the "claimant has not been under a disability as defined in the Social Security Act, from June 18, 2002," the alleged onset date "through the date of [the ALJ's] decision," June 28, 2007. (Tr. 39.)

## IV.   The Medical Evidence Contained in the Record

The certified administrative record contains, *inter alia*, the following medical evidence concerning plaintiff's physical conditions:

**1. Medical records from the State Insurance Fund Corporation ("SIFC")**:  Plaintiff received treatment at the SIFC, which administers Puerto Rico's worker's compensation program, for a number of different work-related injuries and ailments, including a sprained wrist, back

pain, numbness in his fingers, a hip contusion, a herniated disk, and shoulder strain.  (Tr. 238, 265, 269, 272, 283.)  These treatments took place on various dates between August 5, 1999 and June 17, 2003.  (Tr. 228-58, 259-63, 264-405.)  The records reflect that on August 7, 2001, plaintiff was injured on the job at the dairy plant when he was pushing some milk crates and fell backwards, injuring the lower part of his waist.  (Tr. 327).  An MRI taken two months later, on October 17, 2001, showed straightening of the spine, suggesting muscle spasm, hypointense lower lumbar disks, showing disk dessication, and a far lateral disk extrusion at the L4/L5 level.  (Tr. 337.)  The rest of the disks were well-preserved.  (Tr. 337).  Progress notes from a SIFC physician dated a few days after the MRI indicate that plaintiff had left shoulder strain, lumbar strain, and left hip strain.  (Tr. 335.)  On March 7, 2002, the records show that he was discharged from the SIFC because surgery was not being considered at that time.  (Tr. 327.)  He was prescribed physical therapy but missed several appointments due to problems at work.  (Tr. 320.)  By September 2002, progress notes show that plaintiff was not limping, showed a good walking gait, and had very few muscle spasms towards the lumbar sacrum.  (Tr. 314.)  By October of that year, he reported that he was feeling better, though he continued to attend physical therapy and appointments with the SIFC doctors for his leg and back pain.  (Tr. 307.)  In February of 2003, plaintiff was still receiving treatment for the same symptoms and had a diagnosis of bilateral radiculopathy, but was observed with a normal gait and no limp.  (Tr. 283-85.)  The last progress notes for the leg and back pain treatment appear to be from April of 2003.  (Tr. 269.)  Plaintiff still reported pain in his left leg and lower back, but he was feeling better.  (Tr. 269.)  The last report of treatment from the SIFC was on June 17, 2003, showing that plaintiff was treated for an emotional condition and was authorized to continue medical treatment while taking medical

leave from work.  (Tr. 265-66)

**2.  A physical RFC questionnaire completed by Dr. Carlos Muñiz Molinero, an internist**: Dr. Muñiz treated plaintiff on a monthly basis from February 6, 2001 to July 23, 2004. (Tr. 504-508.)  He diagnosed plaintiff with depression and fibromyalgia.  (Tr. 504.)  He opined that plaintiff could rarely lift less than 10 pounds in a competitive work situation and that could rarely twist, crouch, squat or climb, but could stoop and bend occasionally.  Dr. Muñiz recommended that plaintiff work in a job that allowed for sitting, standing, and walking at will. (Tr. 506.)  He also estimated that plaintiff's impairments would likely cause him to be absent from work for about four days per month.

**3.  A form completed by plaintiff's physician, Dr. Domingo Méndez on February 18, 2004:** Dr. Méndez diagnosed plaintiff with carpal tunnel syndrome, anxiety, depression, and herniated nucleous pulposes.  (Tr. 453-55.)  He concluded that plaintiff could not be expected to tolerate an 8-hour work day, five days per week, on a sustained basis, and estimated his residual functional capacity to be between 20-25%.  Additionally, if plaintiff were required to work a full 8-hour shift, Dr. Méndez opined that plaintiff would need to rest every hour for a half-hour each time.  (Tr. 454.)  Dr. Méndez completed a second assessment of plaintiff's condition on July 19, 2004, in which he cited that in the workplace, plaintiff would be able to lift less than 10 pounds occasionally, and would not be able to twist, stoop, crouch, or climb ladders or stairs.  (Tr. 451.) Finally, there is a note from Dr. Méndez dated February 13, 2007, which recommends that plaintiff not work since "day by day his mental and somatic status is deteriorating," and working will "exacerbate all and each one of [his] symptoms."  (Tr. 526.)

**4. A physical RFC assessment completed March 18, 2004 by state agency non-examining medical consultant Dr. Osvaldo Rivera Marrero:** Dr. Rivera opined that plaintiff can occasionally lift 50 pounds, frequently lift 25 pounds, and stand and/or walk for about 6 hours in an 8-hour workday.  (Tr. 417.)  He found no other physical RFC limitations.  (Tr. 416-23.)  On December 12, 2004, Dr. José R. Pesquera García, another state agency non-examining medical consultant, adopted Dr. Rivera's assessment.  (Tr. 423.)

**5. A consultative neurological examination conducted by Dr. Alfredo Pérez Canabal on October 19, 2004:** Dr. Pérez concluded that plaintiff suffered from cervical myositis and lower back pain.  (Tr. 457.)  He observed no muscle atrophy, adequate strength and an adequate gait.  (Tr. 457.)  He noted that plaintiff reported cervical pain radiating to both arms and shoulders, bilateral hand numbness and cramps, and lower back pain radiating to both legs. (Tr. 456.)  Dr. Pérez observed plaintiff's range of motion in all areas to be within normal limits.

**6. A motor nerve conduction study conducted by Dr. Kathia Baucage on September 14, 2006:** The results were that plaintiff had a severe chronic and a moderate demyelinating and axonal sensory motor median neuropathy at the left and right wrists, respectively, consistent with severe bilateral carpal tunnel syndrome.  (Tr. 502.)  Dr. Baucage recommended a surgical consult for this issue.  (Tr. 502.)  There was no evidence of peripheral polyneuropathy, myopathy, or plexopathy.  (Tr. 502.)

The administrative record contains, *inter alia*, the following medical evidence concerning plaintiff's mental conditions:

**1. A consultative psychiatric evaluation by Dr. Alberto Rodríguez Robles performed on February 9, 2004 via referral by the state Disability Determination Service**

("DDS"): Dr. Rodríguez noted that plaintiff was depressed and slow, with diminished attention and concentration, but adequate memory.  (Tr. 408.)  Plaintiff was diagnosed with a severe, single episode major depressive disorder, without psychotic features.  (Tr. 413.)  Dr. Rodríguez opined that plaintiff's prognosis was poor and that he had no capacity to handle his own funds. (Tr. 414.)

2. **Records of psychiatric treatment conducted by Dr. Japhet Gaztambide in March, April, and May of 2004:** The three progress notes are mostly illegible, but it appears he diagnosed plaintiff with a recurrent, severe, major depressive disorder, without psychotic features.  (Tr. 439-44.)  A mental RFC questionnaire conducted by Dr. Gaztambide on February 13, 2007 states that plaintiff was diagnosed with schizoaffective disorder.  (Tr. 530.) Additionally, Dr. Gaztambide selected "extremely limited" for all areas of functioning and indicated that  plaintiff's impairments would cause him to miss more than four days of work per month.  (Tr. 528-30.)

3. **A psychiatric review technique performed on April 2, 2004 by state agency psychiatrist Dr. Jeanette Maldonado:** Dr. Maldonado determined that plaintiff suffered from disturbance of mood and depressive disorder, which were not severe impairments, and had mild or no degree of limitation in different areas of functioning.  (Tr. 425-35.)

4. **A psychiatric evaluation by consulting psychiatrist Dr. Armando Caro on October 25, 2004:** Dr. Caro diagnosed plaintiff with major depressive disorder and moderate pain disorder associated with a general medical condition.  (Tr. 471-76).  He assessed a global assessment of functioning ("GAF") score of 55-60, showing moderate limitations.  (Tr. 472.)[4]

---

[4] The GAF "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'"  Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ["DSM-IV-

5. **An RFC analysis by state agency psychiatrist Dr. Orlando Reboredo, dated December 7, 2004:** The form indicates that plaintiff is not significantly limited in most areas of functioning.  (Tr. 493-95.)  Dr. Reboredo marked that plaintiff was "moderately limited in the following areas of functioning: the ability to understand, remember, and carry out detailed instructions, the ability to sustain an ordinary routine without supervision, and the ability to interact appropriately with the general public.  (Tr. 493-94.)  The form indicates that Dr. Reboredo based his conclusions on the medical evidence in the record at that time.  (Tr. 478, 494.)

## V.     ANALYSIS

The ALJ's decision reflects an application of last step of the five-step evaluation process set forth in the Social Security Agency's regulations.  See 20 C.F.R. § 404.1520.  The ALJ determined that plaintiff's impairments prevented him from being able to perform his past relevant work, but that his RFC permitted him to engage in other work that is available in the national economy.  (Tr. 38.)  Plaintiff objects to the ALJ's decision on three grounds: (1) that the ALJ violated his due process and statutory rights by failing to hold the hearing; (2) that the ALJ should have given his treating sources' opinions controlling weight and (3) that the ALJ did not carry his burden of showing that there are jobs in the national economy that plaintiff can perform because he did not sufficiently take his mental impairments into account.

---

TR"], quoted in Langley v. Barnhart, 373 F.3d 1116, 1122 n. 3 (10th Cir. 2004).  It "considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM–IV–TR at 34 (brackets omitted), quoted in Echandy–Caraballo v. Astrue, 2008 WL 910059 at *4 n. 7 (D.R.I. Mar. 31, 2008).  A GAF score between 61–70 is indicative of "[some] mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM–IV–TR at 34 (emphasis omitted), quoted in Everson v. Astrue, 2011 WL 1226051 at *7 n. 6 (D. Me. Mar. 29, 2011).

### A.        The ALJ's Failure to Hold the Hearing

Plaintiff claims that his constitutional and statutory rights were violated because the ALJ canceled his hearing without permitting his attorney to present his case.  (Docket No. 14, p. 16.)  He argues that "a full and fair hearing is required under section 205(b) of the Social Security Act and the Due Process clause of the Fifth Amendment and that the sole presentation of a written statement is not an adequate substitute."  (Docket No. 14, p. 16).  He contends that he was thus deprived of the chance to have his attorney present his case and, as a result, the ALJ's decision was not based on a fully developed record.  (Docket No. 14, p. 19).

As an initial matter, the court addresses defendant's argument that plaintiff waived his due process claim by failing to include it in his complaint.  (Docket No. 17, p. 1).  In his complaint, plaintiff alleges only that the Commissioner's finding "that the plaintiff was not disabled was not based upon substantial evidence."  (Docket No. 1).   In his brief to the appeals council and his memorandum of law filed in this case, plaintiff argues that the cancelled hearing violated his statutory and due process rights.  (Tr. 11; Docket No. 14.)  The complaint, however, does not mention the cancelled hearing or plaintiff's right to due process.  Because of this, defendant argues that the court should be precluded from considering this argument in its review of the Commissioner's decision.  (Docket No. 17.)

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff to clearly state his claim for relief in a "short and plain statement."  The purpose of this pleading requirement is to provide "fair notice to the opposing party of the claims asserted against him." Acevedo Martínez v. Coatings, Inc. & Co., 286 F. Supp. 2d 107, 113 (D.P.R. 2003); see also Redondo Borges v. U.S. Dep't of Hous. & Urban Dev., 421 F.3d 1, 5 (1st Cir. 2005) ("A complaint satisfies [Rule 8] if it

contains a short and plain statement of the claim showing that the pleader is entitled to relief, and gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.").  In interpreting Rule 8(a)(2) in the context of motions to dismiss under Rule 12(b)(6), the Supreme Court recently held that a plaintiff must plead sufficient factual allegations to show a plausible entitlement to the relief that he seeks.  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The dual purposes of this pleading standard are to ensure that court do not accept as true legal conclusions alleged in a complaint and that only complaints stating plausible, not merely possible, claims for relief will survive 12(b)(6) motions to dismiss.  Iqbal, 129 S. Ct. at 1950.  Nevertheless, the Court emphasized that "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

The circumstances at bar dictate a liberal application of the Iqbal/Twombly standard due to the unique nature of the Social Security appeals process.  Accord. Sullivan v. Hudson, 490 U.S. 877, 885 (1989) ("As provisions for judicial review of agency action go, [42 U.S.C.] § 405(g) is somewhat unusual.")  The very fact that the Commissioner has not raised this issue in a 12(b)(6) motion, but rather in a memorandum of law opposing plaintiff's request for reversal of the Commissioner's decision, is a reflection of the differences between Social Security appeals and other civil lawsuits.  In such cases, the complaint serves a function that is more akin to a notice of appeal.  Section 205(g) of the Social Security Act limits judicial review to determining whether the Commissioner applied the proper legal standards and based his factual findings upon substantial evidence.  See Manso Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st

Cir. 1996) (per curium) (citing Hudson, 490 U.S. at 885; Richardson v. Perales, 402 U.S. 389, 401 (1971)).  The reviewing court makes its decision on the entire record of the administrative proceedings; it is not limited to the pleadings or the memoranda of law.  See López Vargas v. Comm'r of Social Sec., 518 F. Supp. 2d, 333, 335 (D.P.R. 2007) ("In Social Security cases, the court must examine the record and uphold a final decision of the Commissioner denying benefits, unless the decision is based on a faulty legal thesis or factual error.").  The purpose of any complaint filed pursuant to Section 205(g) is to seek judicial review of the Commissioner's decision within the limits proscribed by the Act.  It therefore need not set forth in detail the review requested, as the Commissioner is already well aware of the scope of review that the district court will perform.  Here, plaintiff's claim of error regarding the cancelled hearing is within the purview of § 205 because it requires the court to determine whether the ALJ applied the correct constitutional and statutory legal standards.

Moreover, it is well-settled that factual allegations within documents described or identified in a complaint that are part of the certified transcript of the administrative proceedings may also be weighed if the plaintiff's claims are based on those documents.  See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).  Here, plaintiff's complaint refers to his request for Appeals Council review.  (Docket No. 1, ¶ 5.)  His brief to the Appeals Council sets forth the same due process argument that he now raises in his memorandum of law, and that brief is included in the certified administrative transcript.  (Tr. 11.) Additionally, as the Commissioner filed the transcript, he had access to these documents, and thus had full and fair notice of these claims.[5]  Therefore, plaintiff did not waive his argument that

---

[5] The Commissioner's argument relies on two cases that are factually and legally distinct from the present one. (Docket No. 17, p.1) (citing Courtney v. Choplin, 195 F. Supp. 2d 649, 650 (D.N.J. 2002); Bacon v. Sullivan, 969

the cancellation of the hearing violated his constitutional and statutory rights by failing to set it forth in his complaint.

Nevertheless, plaintiff's claim of error is not grounds for remand. Plaintiff does not cite any legal authority in support of his contention that Fifth Amendment due process absolutely requires an evidentiary hearing on disability benefits applications and that being heard in writing is not an adequate substitute. (Docket No. 14, ¶ 16.) It is well-settled that hearings to determine eligibility for Social Security disability benefits must comport with due process requirements. See, e.g, Richardson v. Perales, 402 U.S. 389, 401-02 (1971) (accepting claimant's proposition that "due process is applicable to the adjudicative administrative proceeding" and thus to Social Security hearing, but holding this did not prohibit use of examining physician's report as evidence, despite its hearsay character); Davenport v. Astrue, 417 Fed. Appx. 544, 546 (7th Cir. 2011) ("Due process requires that a Social Security claimant be offered a 'full and fair' hearing. This standard is violated if a claimant is not offered a chance to present evidence or where the ALJ exhibits bias or animus against the claimant.") (citations omitted); Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995) ("[D]ue process requires that any hearing afforded claimant be full and fair") (citing Perales, 402 U.S. at 401-02). However, the Supreme Court has never held that the hearing itself is constitutionally required. Rather, the principle that hearings for Social

---

F.2d 1517, 1521-1522 (3d Cir. 1992)). In both of these cases, plaintiffs had failed to exhaust their administrative remedies and thus had not obtained "final decisions" of the Commissioner, a necessary prerequisite for federal court judicial review. Courtney, 195 F. Supp. 2d at 654; Bacon, 969 F.2d at 1521. There is an exception to this jurisdictional bar when a plaintiff raises a "colorable constitutional claim," but both courts found that plaintiff's complaint had failed to raised such an issue, and thus dismissed their cases for lack of jurisdiction. Courtney, 195 F. Supp. 2d at 655 n.4 ("Plaintiff has not explicitly raised any constitutional claims, nor do the allegations in his complaint suggest any conceivable basis for asserting such a claim."); Bacon, 969 F.2d at 1522 (plaintiff did not argue in the district court that her constitutional rights were violated and thus waived any such claims on appeal). Here, by contrast, plaintiff seeks review of a final decision of the Commissioner and thus need not raise a colorable constitutional claim to establish jurisdiction.

Security disability claimants are protected by procedural due process safeguards derives from the general proposition that all administrative adjudications be fundamentally fair.  See, e.g., Withrow v. Larkin, 421 U.S. 35, 46 (1975) ("[A] fair trial in a fair tribunal is a basic requirement of due process.  This applies to administrative agencies which adjudicate as well as to courts.") (citations omitted); Perales, 401 U.S. at 401-02.

By contrast, in Goldberg v. Kelly, 397 U.S. 254 (1970), the Court established an absolute right under the Due Process clause to an oral evidentiary hearing prior to the termination of welfare benefits.  Subsequently, the Court held that the same requirement did not apply to terminations of Social Security disability benefits.  Mathews v. Eldridge, 424 U.S. 319 (1976).  In Mathews, the Court set forth a balancing test to determine the extent and type of procedural safeguards that are required for different types of adjudications.  Id. at 335.  In applying this test, and finding that an oral hearing was not required, the Court highlighted the distinctions between welfare and disability adjudications.  Id. at 343-45.  For example, unlike welfare determinations, which involve a wider range of evidentiary factors that depend on witness credibility and veracity, disability determinations often turn on "routine, standard, and unbiased medical reports by physician specialists."  Id. at 344.  Accordingly, the Court found that the substitution of oral procedures for written ones could not be expected to substantially improve the accuracy of the fact-finding process in disability decision-making.  Id. at 345.  As Mathews addressed the necessity for a hearing in the context of individuals already receiving disability benefits, it cannot be read to require a hearing on initial applications for those same benefits.[6]  In the absence of legal authority holding that the Fifth Amendment requires an oral

---

[6]  Moreover, the Court later noted that, although it had held that "a person receiving benefits has a 'property' interest in their continued receipt," it had never held that applicants for benefits have a "legitimate claim of entitlement to

evidentiary hearing on an application for Social Security disability benefits, the court declines to find that the ALJ's cancellation of plaintiff's hearing was an error of constitutional magnitude.

On the other hand, the Social Security Act does provide a claimant with the right to "reasonable notice and opportunity for a hearing" in connection with his application for benefits. 42 U.S.C. § 405(b)(1); cf. Lonzollo v. Weinbuerger, 534 F.2d 712, 714 (7th Cir. 1976) ("The impact of the due process hearing requirement on Social Security disability benefits is somewhat different from that of the type of benefits involved in Goldberg[,] but [w]hatever may be the minimum constitutional requirements, 42 U.S.C. § 405(b) requires the Secretary to give an applicant an opportunity for a hearing.").  The parties do not dispute that plaintiff voluntarily waived his right to appear personally at the hearing.  However, plaintiff contends that he retained his right to appear through his attorney and that the Social Security agency's regulations and policy manual provide claimants the right to make their appearance through their attorneys. Therefore, plaintiff contends that the ALJ deprived him of this right in canceling the hearing.

As a preliminary matter, regardless of whether plaintiff had a right to appear through his attorney, it is clear that he had due notice of the possibility that the hearing could be cancelled if he did not appear personally.  The notice of hearing, dated April 9, 2007, states the time and place of the hearing and that "[c]laimants *with or without a representativ*e are expected to *personally appear* at the scheduled hearing unless a Motion of Waiver of Appearance is granted or a verifiable excuse is provided."  (Tr. 42) (emphasis added.)  The notice also warned that "[n]otwithstanding a proper Waiver of Appearance, if you do not appear the Administrative Law Judge may proceed to decide your case solely on the medical evidence in the file and any

---

benefits if they me[e]t the statutory qualifications."  Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 321 n.8 (1985) (citing Atkins v. Parker, 472 U.S. 115, 128 (1985); Mathews v. Eldridge, 424 U.S. 319 (1976)).

written statement submitted by your representative without conducting an oral hearing."

(Tr. 42.)  In the affidavit in support of plaintiff's motion for waiver of appearance, he states that

his representative had advised him, *inter alia*, "that the [ALJ] believes that if you do not appear

at such hearing, he can resolve the case based on the evidence of record without conducting such

hearing."  (Tr. 17.)  This statement reflects plaintiff's understanding that the hearing might not

take place if he chose not to attend.  Additionally, the motion appears to have been filed on the

day of the hearing; therefore, it should have been evident to plaintiff that it was possible that the

ALJ would not grant his waiver and might not schedule a new hearing date.

 Plaintiff points out, however, that in the last paragraph of his affidavit, he specified

that he was not waiving the right to have the hearing be held, "where [he] will appear through

[his] attorney," and he argues that he had the right to make his appearance through his attorney.

In support of his contention, plaintiff cites 20 C.F.R. §404.949, which provides that a claimant or

"a person [he] designate[s] to act as his representative may appear before the [ALJ] to state your

case, to present a written summary of your case, or to enter written statements about facts and

law material to your case in the record."  He also cites a section of an internal agency manual

stating that that representatives have the authority to "appear at a hearing either alone on behalf

of the claimant or with the claimant."  See Social Security Administration Hearings, Appeals,

and Litigation Law Manual ("Hallex") § I-1-1-20; see also 20 C.F.R. § 404.950(a) ("Any party to

a hearing has a right to appear before the ALJ . . . .  A party may also make his or her appearance

by means of a designated representative.").  Therefore, plaintiff contends that these provisions,

together with the statement in his affidavit, required the ALJ to let the hearing go forward in his

absence.

"[T]he regulations governing the [Social Security disability] administrative hearing are not the height of consistency." Flatford v. Chater, 93 F.3d 1296, 1302 (6th Cir. 1996). It is therefore unclear whether these regulations, together with the policy guidance, mandate that an ALJ conduct the hearing with the claimant's representative if the claimant requests to waive his own appearance. On the one hand, the regulation that plaintiff cites does allows appearances to be made through a representative. 20 C.F.R. §404.949. However, this regulation is phrased permissively, indicating that it may not be an absolute right. On the other hand, the regulations state that the ALJ may choose not to hold the hearing if "*you* waive your right to appear"; it does not contain any exception for claimants whose representatives appear in their stead. 20 C.F.R. § 404.929 (emphasis added); see also 20 C.F.R. §404.948(b)(1)(i) ("The ALJ may decide a case on the record and not conduct a hearing if you and all the parties indicate in writing that you do not wish to appear before the [ALJ] at an oral hearing."). The regulations also warn claimants that even if they waive the right to a hearing, the ALJ "may notify you of a time and a place for an oral hearing, if the ALJ believes that a personal appearance and testimony by you or any other party is necessary to decide the case." 20 C.F.R. § 404.950(b). Additionally, Social Security Ruling 79-19 requires that an individual who waives his right to appear at a hearing demonstrate, as plaintiff did in his waiver, that he understands that "if he does not appear, the claim will be decided solely on the written evidence in the file . . . ." SSR 79-19, 1975-1982 Soc. Sec. Rep. Serv. 391, 393 (S.S.A.). However, the stated purpose of this Social Security Ruling is to "establish requirements necessary for a valid waiver of an individual's right to appear, in person or through a representative . . . ." Id. at 391. This indicates that, possibly, a claimant may waive his right to appear personally, but not waive his right to appear through a representative.

20

Despite the relative ambiguity regarding the extent of a claimant's right to make an appearance through his representative, the right itself only exists, if at all, by virtue of the agency's regulations and internal policy manuals.[7]  Therefore, assuming that the regulations provide a claimant the right to appear at a hearing through his representative when he has waived his own appearance, the violation of such right would only provide cause for remand if plaintiff can show that it affected his substantive rights.  See, e.g., Morton v. Ruiz, 415 U.S. 199, 235 (1974) ("[W]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."); Rodríguez v. Sec'y of Health & Human Servs., 46 F.3d 1114 (1st Cir. 1995) (unpublished) (declining to remand where ALJ erred but error was harmless); Sánchez v. Barnhart, 230 F. Supp. 2d 250, 253 n.4 (D.P.R. 2002) (same).  Plaintiff has not shown that his rights were in any way prejudiced by the ALJ's failure to conduct the oral hearing with only his attorney present.  As plaintiff correctly notes, the purpose of the hearing in the disability determination process is for the claimant to "submit new evidence, examine the evidence used in making the determination or decision in your case, [ ] present and question witnesses," and answer any questions that the ALJ may have for the claimant.  20 C.F.R. § 404.929.  None of these objectives were compromised by the ALJ's cancellation of the hearing.  There is no indication in the record that either the ALJ or plaintiff intended to call any witnesses to testify,[8] nor does plaintiff contend in his memorandum that he had planned to do so.  Moreover, because no hearing took place and no testimony was taken, he was not deprived of the opportunity to

---

[7]  The section of the Social Security Act relating to representation does not create a right to representation; rather, it merely provides that an attorney "shall be entitled to represent claimants before the Commissioner of Social Security, and that the Commissioner "may prescribe rules and regulations governing the recognitions of agents or other persons" who may represent Social Security claimants.  42 U.S.C. § 406.

[8]  The regulations allow the ALJ or the claimant, upon request to the agency, to subpoena witnesses to testify at the hearing.  20 C.F.R. § 404.916.

cross examine witnesses.  Similarly, plaintiff does not contend that his attorney was not afforded the opportunity to review the evidence of record prior to the ALJ's rendering of his decision. Additionally, the ALJ gave plaintiff's counsel the opportunity to present written arguments and evidence.

Therefore, the cancellation of the hearing deprived plaintiff of only two procedural safeguards: the opportunity to present his own testimony and his attorney's oral argument. Plaintiff clearly waived his right to testify and plaintiff's contention that oral argument was necessary is unconvincing.  See Mathews, 424 U.S. at 343-45 (holding that the substitution of oral procedures for written procedures could not be expected to substantially improve the accuracy of the fact-finding process in disability decision-making).  Therefore, plaintiff cannot maintain cancellation of the hearing impeded his ability to present his case or develop the record.

The basic requirements of due process in administrative adjudications are notice and an opportunity to be heard.  See P.R. Aqueduct & Sewer Auth. V. U.S. E.P.A., 35 F.3d 600, 606 (1st Cir. 1994).  Plaintiff had an opportunity for the ALJ to hear his testimony, but he unequivocally waived that right.  He had an opportunity to present his attorney's arguments and evidence in writing, but chose not to do so.  Therefore, no unfairness or clear prejudice resulted from plaintiff's deprivation of the opportunity to have his attorney appear at the hearing in his stead, and it is unnecessary to remand the case on these grounds.

**B.        Failure to Give Controlling Weight to Treating Physicians' Opinions**

Plaintiff claims that the ALJ improperly gave more weight to the evaluations by state agency and consulting doctors than to those rendered by his treating physicians.  Although the ALJ considered the medical reports from plaintiff's treating physicians, Dr. Muñiz and

Dr. Méndez, he assigned greater probative value to the records from non-treating examining

consulting physicians, such as Dr. Pérez and Dr. Rodríguez.

In a disability adjudication, an ALJ should generally give more weight to opinions

from the claimant's treating physicians, as they are the medical professionals that can most likely

provide a detailed, longitudinal picture of the claimant's medical impairments, which may not be

readily discernable from objective medical findings or consultative examinations.  20 C.F.R. §

404.1527(d)(2).  See Berríos-Vélez v. Barnhart, 402 F. Supp. 2d 386, 391 (1st Cir. 1991).

However, in order to assign controlling weight to such opinions, they must be well-supported by

medically acceptable clinical and laboratory diagnostic techniques and be consistent with other

substantial evidence in the case record.  Id.; see Shaw v. Sec'y of Health & Human Servs., 25

F.3d 1037, at *3 (1st Cir. 1994) (unpublished).  When a treating source's opinion is not deemed

controlling, the ALJ should decide what weight to give it depending on the following factors: the

length of the treatment relationship, frequency of examination, nature and extent of the treatment

relationship, the degree to which the opinion is supported by medical signs and laboratory

findings, the consistency of the opinion with the record as a whole, and whether the opinion was

from a specialist.  20 C.F.R § 404.1527(d)(2)-(5).

Based on the evidence of record, the ALJ had a reasonable basis to assign greater

weight to the treating physicians at the SIFC and the consulting physicians than to Dr. Muñiz and

Dr. Méndez.  (Tr. 33.)  The evaluation forms submitted by Dr. Muñiz and Dr. Méndez are

neither sufficiently detailed nor numerous enough to constitute the type of "longitudinal picture"

contemplated by 20 C.F.R. § 404.1527(d)(2).  For example, even though Dr. Muñiz claims that

he treated plaintiff monthly for over 3 years, there are notes from only 8 meetings during this

time period. (Tr. 504, 516-517, 521.)  Similarly, Dr. Méndez indicated that he treated plaintiff

every 2-3 months from August 20, 2001 through February 13, 2007 (Tr. 448, 532), but there is

only evidence of one evaluation from February 2004 and a few progress notes from February and

March 2007. (Tr. 448-55, 524-27,532-34).  Furthermore, the evidence from the visits to

Dr. Muñiz and Dr. Méndez is almost exclusively in the form of checklists and conclusions that

are not substantiated by clinical or laboratory tests.  Finally, there are contradictions between

Dr. Méndez's and Dr. Muñiz's conclusions, which further weaken their credibility.[9] (Tr. 451,

507.)

By contrast, the documentation from plaintiff's evaluations by Dr. Pérez and

Dr. Baucage also reflect that he suffered from several physical impairments, including a severe

chronic and a moderate demyelinating and axonal sensory motor median neuropathy at the left

and right wrists, respectively, consistent with severe bilateral carpal tunnel syndrome, cervical

myositis, and lower back pain. (Tr. 457, 502.)  However, these conclusions were based on a

detailed range of motion charts and laboratory diagnostic techniques.  (Tr. 456-470, 501-502.)

Therefore, they constitute the kind of evidence that the ALJ may rely upon to determine

plaintiff's disability status.  See Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 13

(1st Cir. 1982).  Additionally, the ALJ noted that these evaluations were consistent with the fact

that plaintiff reported that he was able to take care of his personal needs, despite his pain and

discomfort.  (Tr. 37.)  Moreover, the ALJ had good reason to rely on the SIFC records as they

included numerous progress notes covering a long time period (1999 to 2003), which included

---

[9] For example, in a RFC questionnaire, completed by Dr. Méndez on July 19, 2004, he notes that plaintiff must use a cane or other assistive device while engaged in occasional standing/walking.  (Tr. 448, 451.)  In the same questionnaire completed by Mr. Muñiz on July 23, 2004, he notes that plaintiff does not require a cane or other assistive device.  (Tr. 504, 507.)

the alleged onset date of June 18, 2002.

Regarding the opinion from Dr. Gaztambide, plaintiff's treating psychiatrist, the ALJ assigned his findings a lesser weight due to their lack of foundation.  (Tr. 34-36.)  For example, Dr. Gaztambide diagnosed plaintiff with a schizoaffective disorder with hallucinations, and reported that plaintiff had suicidal thoughts and illogical thinking.  However, plaintiff never stated that he suffered from or had been diagnosed with schizoaffective disorder in his disability application or appeal documents, nor did either of the consulting psychiatrists reach such a diagnosis.  Moreover, the consulting psychiatrists noted a lack of suicidal or illogical thoughts. In his February 9, 2004 evaluation Dr. Rodríguez, found that plaintiff had slow, but logical and coherent, thoughts and no suicidal ideas.  (Tr. 412-413.)  On October 25, 2004, Dr. Caro reported that plaintiff denied suicidal ideas, or hallucinations, and his speech was fluent, coherent and logical.  (Tr. 472.)  The record does not reflect any mention of a schizoaffective disorder or illogical thoughts by any of plaintiff's other treating or consulting medical professionals. (Tr. 528-531.)  Moreover, as the ALJ noted, it is difficult to determine the basis for Dr. Gatzambide's findings because his reports do not indicate how frequently he treated plaintiff. The record contains only three progress notes from Dr. Gatzambide covering a relatively brief time span, dated March 15, 2004, April 16, 2004, and May 21, 2004.  (Tr. 439-44.) Additionally, on the RFC questionnaire that Dr. Gatzambide completed, he checked off that plaintiff was "extremely limited" (the maximum possible limitation on the form) in every single area of functioning, which the ALJ reasonably concluded was not credible in light of the other medical evidence.

Dr. Gaztambide's reports are also internally contradictory.  In his evaluation of

plaintiff on March 15, 2004, he diagnosed plaintiff with major depressive disorder and a GAF of 60.  (Tr. 444.)  His progress notes from March 15, 2004 through May 21, 2004, indicate a diagnosis of DSM IV code 296.33, major depression, recurrent and severe, without psychotic features.  (Tr. 439-44.)  However, in the RFC form that Dr. Gaztambide prepared on March 20, 2007, he indicated that plaintiff's diagnosis was schizoaffective disorder (DSM IV 295.70), and did not list major depression (DSM IV 296.33) as a diagnosis.  (Tr. 529.)  This RFC form asks the psychiatrist to provide "the earliest date the description of symptoms and limitations on this questionnaire applies," to which Dr. Gatzambide responded March 15, 2004.  (Tr. 531).  However, as already mentioned, the March 15, 2004 evaluation indicated major depressive disorder, not schizoaffective disorder, and a GAF score of 60, which is consistent with moderate, not extreme, limitations.  See, supra note 4.  Moreover, there is no other medical evidence in the record that mentions schizoaffective disorder aside from Dr. Gatzambide's March 20, 2007 RFC assessment, completed two months before the hearing was scheduled to take place, and after plaintiff's application had been denied at the initial level and upon reconsideration.

In contrast to plaintiff's treating psychiatrist, the documentation from medical specialists from the Disability Determination Service, as well as consultative evaluations from Dr. Rodríguez and Dr. Caro give a more detailed, consistent picture of plaintiff's mental health condition.  This evidence shows that plaintiff suffered from moderate recurrent to severe single episode depression. (Tr. 406-14; 428, 471-73.)  The ALJ thus appropriately gave controlling weight to medical reports that came from sources other than plaintiff's treating physicians. Further, the ALJ did not err by assigning Dr. Gaztambide's reports a lesser weight when compared to more detailed evidence from psychiatric evaluations performed by other medical

professionals in the record.  The ALJ reasonably concluded that the preponderance of the

medical evidence of record showed that plaintiff's major depressive disorder was moderately

limiting, but did not support Dr. Gatzambide's picture of "an extremely limited, practically

catatonic, nearly hermit individual."  (Tr. 35-36.)

### C.        The ALJ's Determination that Plaintiff Could Perform Alternate Jobs

Plaintiff's final contention is that the ALJ did not carry his burden at step five in

finding that there were jobs in the national economy that he could perform in light of his RFC,

age, education and past work experience.  In making this finding, the ALJ used the medical-

vocational rules ("the Grid"), found at 20 C.F.R. §404, Subpart P, App. 2, as a "framework" and

also relied on "vocational specialists from the Disability Determination Service, the State

agency," who "considered whether jobs exist in the national economy for an individual with the

claimant's age, education, work experience, and residual functional capacity."  (Tr. 38-39.)

Plaintiff objects that the reports from the vocational specialists are unsigned, that there is no

information about their qualifications, and that he had no opportunity to cross examine them.

(Docket No. 14, p. 10-11.)  Defendant does not contest plaintiff's argument as to the vocational

specialist reports, but instead maintains that the ALJ should be deemed to have relied exclusively

on the Grid, because he did not use vocational expert testimony, and that reliance on the Grid

was permissible in this case.  (Docket No. 13, pp. 21-22.)[10]  Plaintiff, however, contends that

exclusive reliance on the Grid was not be appropriate in this case because his mental impairment

imposes substantial restrictions on his ability to perform unskilled work.

The medical-vocational rules ("the Grid") are designed to help the Commissioner at

---

[10] Social Security Ruling 00-4p clarifies that vocational experts are individuals who provide testimony before ALJs
and vocational specialists provide evidence to adjudicators at the state agency disability determination services.

step five to determine if jobs exist in the national economy for a given claimant "in a streamlined fashion without resorting to the live testimony of vocational experts." Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989). The rules reflect "major functional and vocational patterns" based on data about the jobs existing in the national economy. 20 C.F.R. § 404.1569. Each rule directs a finding of "disabled" or "not disabled" based on the particular combination of the claimant's physical RFC (light work, medium work, heavy work, or very heavy work) and vocational factors (age, education, and work experience). 20 C.F.R. §404, Subpart P, App. 2 § 200.00(a). Because the rules are based only take into account "limitations in meeting the strength requirements of jobs," known as "exertional limitations," they are not conclusive where the claimant has other limitations not related to strength, known as "non-exertional limitations." 20 C.F.R. §404, Subpart P, App. 2 § 200.00(e).[11] When a claimant has both exertional and non-exertional limitations, and the Grid does not direct a finding of disability, the regulations indicate that the rule reflecting the claimant's age, education, work experience, and RFC should be used "as a framework" for determining the extent to which the non-exertional impairments deplete the number of potential jobs that the claimant can perform. 20 C.F.R. §404, Subpart P, App. 2 § 200.00(e)(2). In such cases, whether the ALJ can rely on the Grid depends on how much the non-exertional impairments reduce the potential job base at the relevant exertional level—in plaintiff's case, the light work level. Ortiz, 890 F.2d at 524; Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 194 (1st Cir. 1987). Interpreting this regulation, the First Circuit has held that an ALJ can rely on the Grid if the non-exertional impairments reduce the occupational base only "marginally." Ortiz, 890 F.2d at 524.

---

[11] Examples of non-exertional limitations are mental functions, such as concentration and attention, or postural restrictions, such as bending, climbing, or crouching. 20 C.F.R. § 404.1569a(c).

Here, the ALJ found that plaintiff's RFC limited him to light work and that he had the following non-exertional limitations: moderate depression and an inability to perform activities requiring frequent climbing or stooping.  (Tr. 35-36.)  The ALJ indicated that plaintiff's depression merely affected the occupational skill level at which he could perform, limiting him to unskilled work.  (Tr. 36.)[12]  Defendant thus argues that reliance on the Grid was appropriate because the ALJ sufficiently considered plaintiff's mental impairment in limiting him to a specific skill level, and thus correctly concluded that he could perform the full range of unskilled light work identified by the Grid.

In Ortiz, the court held that "such a shorthand approach" was indeed permissible in applying the Grid, but only if "the factual predicate (that the claimant's [mental condition] does not interfere more than marginally with the performance of the full range of unskilled work) is amply supportable."  890 F.2d at 526.  This inquiry involves two separate determinations: whether, in light of his mental limitations "(1) a claimant can perform close to the full range of unskilled work, and (2) whether he can conform to the demands of a work setting, regardless of the skill level involved."  Id.  In applying this inquiry to the case of a claimant with dysthymic disorder (chronic depression) and a restricted ability to bend from the waist, the Ortiz court found the question to be a "close one" and noted that that it was an "unusual instance where reliance on the Grid is permissible despite the existence of a significant nonexertional limitation," but, "on balance" found the ALJ's reliance on the Grid supportable.  Id. at 528.  The question here is also a close one.  There is ample evidence in the record showing that plaintiff retained the skills to perform close to the full range of unskilled work; however, the record is not

---

[12] The ALJ did not indicate at what skill level plaintiff could perform if it were not for his mental impairment.

as clear with respect to his ability to conform to the demands of the work setting in general.

    With respect to the first step of the Ortiz inquiry, the record does clearly show that plaintiff has the skills to perform the full range of unskilled work. "The basic mental demands of . . . unskilled work include the abilities (on a sustained basis) to 'understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.'" Id. at 526 (citing Social Security Ruling 85-15, 1985 WL 56857 (S.S.A. 1985)).  Determining whether an individual can perform this work "requires careful consideration of RFC." Id.  In making his finding as to plaintiff's mental RFC, the ALJ relied on the opinions of the consulting and state agency psychiatrists.  It has already been established that this finding was based on substantial evidence. See supra § V.B.  The RFC assessment completed by Dr. Reboredo, the state agency psychiatrist, included a list of several skills areas, including all of the "basic mental demands" needed for unskilled work listed in SSR 85-15.  (Tr. 493-94.)  As to each of those basic mental demands, Dr. Reboredo indicated that plaintiff was "not significantly limited." Id.  While the consulting psychiatrists did not complete RFC forms, their written evaluations are consistent with Dr. Reboredo's findings as to these basic mental demands.  Dr. Rodríguez noted that plaintiff had good interpersonal relationships and had gotten along with his coworkers and supervisors in his previous job.  (Tr. 412.)  Additionally, both doctors noted that his memory was adequate, except for his short term memory, which Dr. Caro found was "impaired."  (Tr. 412, 472.)  Plaintiff scored 20 out of 30 on the Mini Mental Status Exam, indicating only moderate cognitive impairments.  (Tr. 475.)  While both doctors noted that his flow of thought was slow, it was also coherent, logical, and relevant.  Id.  These evaluations are consistent with Dr. Reboredo's

assessment that plaintiff is moderately limited in his ability to understand, remember, and carry out detailed instructions, but not significantly limited with respect to simple instructions.  (Tr. 493-94.)  Therefore, substantial evidence in the record supports a finding that plaintiff has the skills to carry out the tasks required by the full range of unskilled work.

The second prong of the <u>Ortiz</u> inquiry requires an assessment of whether a claimant can "accommodate to the demands of a work setting," without consideration of his skill level. <u>Ortiz</u>, 890 F.2d at 527.  The Commissioner has recognized that "the mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day."  <u>Id.</u> (citing SSR 85-15 at 6).  Accordingly, he has "emphasized the importance of thoroughness in evaluation on an individual basis" of how an "individual's response to [the] demands of work" affects his RFC. SSR 85-15 at 6.  The ALJ's decision reflects little of the individualized analysis that the Commissioner's ruling contemplates.  However, the evidence of record does not show that plaintiff's mental condition has more than a marginal effect on his ability to adapt to the work setting.  Dr. Reboredo concluded that plaintiff was "not significantly limited" in his abilities to maintain a schedule, be punctual, maintain regular attendance, and complete a normal workday without unreasonable interruptions.  Additionally Dr. Rodríguez found that plaintiff had gotten along with his coworkers and supervisors in his previous job.  While Dr. Rodríguez also found that plaintiff "felt restless and nervous," keeps to himself, spends most of his day in the house, and does not attend social activities, this evidence is not necessarily inconsistent with Dr. Reboredo's assessment.  Therefore, there is no indication that plaintiff's mental condition affected the unskilled occupational base more than marginally.  Under these circumstances, the

ALJ's reliance on the grid was appropriate.

**VI.**     CONCLUSION

For the foregoing reasons, the decision of the Commissioner is hereby AFFIRMED.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 11th day of April, 2012.

s/Marcos E. López
U.S. Magistrate Judge
